# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **SHERRYL SNODGRASS CAFFEY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil Action No. CV-02-S-0755-NE** |
| ) | |
| **STATE OF ALABAMA,** *et al.,* ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

Plaintiff, Sherryl Snodgrass Caffey, an attorney proceeding *pro se*, commenced this action on March 25, 2002.[1]  Her original and amended complaints[2] asserted numerous constitutional claims pursuant to 42 U.S.C. § 1983, as well as state law claims, all arising out of an incident involving her defense of a client in a criminal proceeding pending before former defendant James W. Woodroof, Jr., a Limestone County, Alabama, Circuit Judge.[3]  During the incident, Judge Woodroof adjudged plaintiff to be in contempt of court, and ordered her incarcerated in the Limestone County Jail.

This court dismissed all of plaintiff's claims on September 5, 2002, on the

---

[1]*See* doc. no. 1 (Complaint).

[2]*See* doc. no. 16 (Amended Complaint).

[3]Plaintiff named Judge Woodroof as a defendant in her original complaint, but he was dismissed on September 5, 2002.  *See* doc. no. 21.

grounds that the *Rooker-Feldman* doctrine[4] precluded it from exercising subject matter jurisdiction.[5]  Plaintiff appealed, and the Eleventh Circuit affirmed this court's dismissal of all claims, other than plaintiff's Eighth Amendment claim for unconstitutional prison conditions, and her one state law claim also addressing prison conditions, both of which were brought against only the following defendants: Limestone County, the Limestone County Commissioners, Limestone County Sheriff Mike Blakely, and Deputy Sheriff Allen Craig.[6]  Plaintiff sued Blakely and Craig in both their individual and official capacities, but she sued the Limestone County Commissioners in their respective official capacities *only.*[7]

On remand, this court dismissed plaintiff's Eighth Amendment claim for failure to state a claim upon which relief could be granted.  The court also declined to exercise supplemental jurisdiction over plaintiff's remaining state law claim, and dismissed that claim as well, but without prejudice to her right to assert it in a state court action.[8]

---

[4]*See District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 476-82 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 415-16 (1923).

[5]*See* doc. no. 21.

[6]*See* doc. no. 26 (April 4, 2003 Mandate from Eleventh Circuit Court of Appeals).  The Eleventh Circuit stated, "[a]lthough somewhat unclear, this one state claim [relating to prison conditions] appears to involve only the defendants named in Caffey's Eighth Amendment claim." *Id.* at 12 n.8.

[7]*See* doc. no. 1 (Complaint).

[8]*See* doc. nos. 29 & 30.

Plaintiff again appealed to the Eleventh Circuit, which reversed.[9]  The Eleventh Circuit agreed that many of plaintiff's allegations did not rise to the level of an Eighth Amendment violation.[10]  Even so, the Eleventh Circuit held that plaintiff's allegations of opposite-sex viewing while she was incarcerated *did* support a viable claim under the Eighth Amendment, and it again remanded the case to this court to consider plaintiff's claim.[11]

Plaintiff's original complaint contains the following allegations relevant to her opposite-sex-viewing claim:

> Caffey was placed in the all-male section of the jail, in a cell containing a window which permitted male inmates and jailers to gawk at her and to taunt her.  Additionally, her cell contained a camera, which was focused on her the entire time of her incarceration.  This camera was manned by men.  Additionally, male jailers entered her cell without any warning at their pleasure.[12]

> . . . .

> [H]er incarceration in a jail cell with a window and a camera, which provided male inmates, jailer [sic], and visitors a view of her in the cell at all times and under all circumstances, and the un-noticed entry of male jailers into her cell constitute an intrusion upon her physical

---

[9]Doc. no. 42.

[10]*Id.* at 10 n.8.

[11]*Id.* at 10.  ("What Caffey is effectively complaining about is having to expose her sexual organs to members of the opposite sex when she undressed or used the toilet in solitary confinement. It is only this particular aspect of her Eighth Amendment claim that survives Rule 12(b)(6).").

[12]Doc. no. 1 (Complaint), at ¶ 7.

solitude and seclusion.[13]

Her *amended* complaint contained the following allegations relevant to her opposite-sex viewing claim:

> Plaintiff asserts that Limestone County, the Limestone County Commissioners, Sheriff Blakely, and Deputy Sheriff Craig were the persons responsible for the administration, operation, and maintenance of the Limestone County Jail under the laws of the State of Alabama; and that the jail structure at the time of her incarceration was inadequate, unhealthy, and unsafe.
>
> . . . .
>
> Plaintiff further asserts that the aforesaid Defendants maintained a policy, custom and practice of incarcerating inmates under unlawful and humiliating conditions, which violated their right to privacy; that said practice violated clearly established constitutional rights, and that she was a victim of the same during her 24 hour incarceration in that she was subjected to cruel and unusual punishment in violation of the *8th Amendment to the United States Constitution* by being incarcerated in the all male section of the jail in a windowed cell and with a camera manned by men trained on her at all times, and with male jailers entering her cell at will. . . . She further asserts that male inmates and male jailers were permitted to invade her privacy by gawking at her through the window and through the camera lens, and by directing lewd and obscene statements and gestures to her.
>
> Plaintiff further avers that the Defendants acted under color of State law and in the line of duty, but beyond the scope of their discretionary authority; and that they acted illegally, in bad faith, and with such neglect, carelessness, and unskillfulness in their commission of the aforesaid acts that they are not entitled to immunity. Plaintiff further avers that the Defendants acted willfully, maliciously,

---

[13]*Id.* at ¶ 57.

fraudulently, and beyond their authority.[14]

Plaintiff claims she suffered "severe mental anguish and emotional distress, humiliation, [and] inconvenience" as a result of defendants' alleged violations.[15]  She requests compensatory and punitive damages, costs, interest, and fees for serving as her own attorney.[16]

Defendants Blakely and Craig (the "Sheriff defendants") jointly moved for summary judgment on all of plaintiff's claims.[17]  Defendants Limestone County and the Limestone County Commissioners (the "County defendants") also filed a joint motion for summary judgment.[18]  Those motions are considered in this opinion.

## PART ONE

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but also that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

---

[14]Doc. no. 16 (Amended Complaint), at ¶¶ 26-28 (emphasis in original).

[15]Doc. no. 1 (Original Complaint), at ¶ 66.

[16]*Id.*

[17]Doc. no. 49.

[18]Doc. no. 52.

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

## PART TWO

### *Statement of Facts*

The following facts are relevant to defendants' motions for summary judgment.[19]

---

[19]Plaintiff disputes many of the facts set forth in the Statement of Facts sections of both briefs filed by counsel in support of summary judgment. However, in many instances, plaintiff either cites to no evidence to support her position, or cites to portions of the record which do not support her

**A.**  *Facts Relevant to All Defendants*

On March 23, 2000, plaintiff was found in open contempt of court by Limestone County Circuit Judge James Woodroof, who ordered that she be arrested and transported to the Limestone County Jail, where she was incarcerated for a period of approximately twenty-six to twenty-seven hours.[20]

**B.**  *Facts Relevant to Defendant Allen Craig*

Defendant Allen Craig, a Limestone County Deputy Sheriff, effected the arrest and transported plaintiff to the Limestone County Jail.[21]  Plaintiff does not recall seeing Deputy Craig again after he took her to the jail.[22]  Plaintiff testified that she named Deputy Craig as a defendant in order to allege an assault claim against him based on the manner in which he placed her into the Sheriff's Department vehicle

---

objection to the stated fact.  In her own brief, plaintiff also sets forth factual statements which are not supported by any evidence in the record.  In finding the facts relevant to defendants' motions for summary judgment, the court will construe the relevant evidence in the light most favorable to plaintiff.  However, the court will not rely on any factual assertions which are not supported by evidence of record.  *See* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").  *See also* doc. no. 47 (Uniform Initial Order), Appendix II (Summary Judgment Requirements), at 16-18 (requiring that all statements of fact and objections to statements of fact be supported by citations to specific portions of the evidentiary record).

[20]Doc. no. 51 (evidentiary submission by defendants Blakely and Craig), Exhibit A (Deposition of Cheryl Snodgrass Caffey), at 14-16, 23.

[21]*Id.* at 18, 30-31.

[22]*Id.* at 30-31.

following her arrest.  Plaintiff's assault claim since has been dismissed.[23]

**C.**    *Facts Relevant to Defendant Mike Blakely*

During her incarceration, plaintiff spoke with Limestone County Sheriff Mike Blakely on three occasions:  once to discuss Judge Woodroof's order holding her in contempt of court, and twice to make arrangements for meetings with visitors.[24] While plaintiff was being "booked" into the county jail, the booking officer asked her to sign a form entitled "Bedding Checklist."  This form lists the bedding and personal items issued to the inmate, recites that the inmate will be responsible for any lost or damaged items, and further states:  "I . . . give the Limestone County Jail permission to open any and all types of mail I may receive while I am incarcerated."[25]  Plaintiff refused to sign the form because she did not want to give jailers permission to read her mail.[26]  Sheriff Blakely states that inmates must give jailers permission to open, *but not to read,* their mail as a security measure, to prevent the transportation of drugs, impermissible medication, or weapons into the jail.[27]  Plaintiff provided all

---

[23]*Id.* at 113-14.  *See also* doc. nos. 20 & 21.  The assault claim was dismissed in this court's September 5, 2002 order, and it was not part of the Eighth Amendment claim remanded by the Eleventh Circuit on April 4, 2003.  *See* doc. no. 26 (April 4, 2003 Mandate from the Eleventh Circuit).

[24]Caffey Deposition, at 32-35.

[25]Doc. no. 51 (evidentiary submission by defendants Blakely and Craig), at Exhibit B ("Bedding Checklist"); doc. no. 71 (Supplemental Affidavit of Mike Blakely), at ¶3.

[26]Caffey Deposition, at 27-28.

[27]Blakely Supplemental Affidavit, at ¶ 3.

other information requested during booking, and she signed all other forms presented to her.[28]

The first floor of the Limestone County Jail[29] was laid-out in a linear fashion. From the entry and booking areas, a long hallway led to the kitchen on the right, and to the following succession of rooms on the left: an office; two holding cells ("drunk tanks"), separated by a wall and secure doors; two isolation cells; and a room for conducting blood alcohol testing procedures. The female dormitory area was located at the end of this hallway.[30] Male inmates were housed on the second and third floors of the jail.[31]

After plaintiff had been booked, she was taken to the female dormitory area of the jail, where she remained for approximately one hour.[32] She spent the remainder of her incarceration in the second holding cell, or "drunk tank."[33] Limestone County corrections officers used the jail's holding cells for several purposes. The two holding cells were located adjacent to the booking area, and officers often placed

---

[28]Caffey Deposition, at 23, 28.

[29]This characterization represents the layout of the jail in 2000, at the time plaintiff was incarcerated. Limestone County since has constructed a new jail facility.

[30]*See* doc. no. 63 (plaintiff's evidentiary submission), Exhibit 8 (Deposition of Vanessa Rich), at Appendix 1 (diagram of Limestone County Jail in 2000).

[31]Doc. no. 51 (evidentiary submission of defendants Blakely and Craig), Exhibit D (Affidavit of Mike Blakely), at ¶ 10.

[32]Caffey Deposition, at 29.

[33]Blakely Affidavit, at ¶ 6; Caffey Deposition, at 47.

inmates in the cells for convenience while the booking process was being completed.[34]  Officers also held inmates in the cells temporarily if more than one inmate was being booked at the same time.[35]  Finally, officers placed inmates in the cells when they refused to cooperate in some aspect of the booking process.[36]  This arrangement was not intended to punish the inmate, but to keep the inmate nearby, so that additional information could be easily gathered.[37]

Sheriff Blakely stated that plaintiff was placed in a holding cell for two reasons:  for refusing to sign the portion of her booking form which granted officers permission to open her mail; and for her own protection, as she was being incarcerated for a contempt charge and not for some more serious, or more violent, criminal offense.[38]  The Policy and Procedure Manual for the Limestone County Jail allows the Sheriff to place an inmate in single-cell housing when doing so is "necessary for the inmate's protection, the security and good order of the Limestone County Jail, or the safety of the community."[39]

Both male and female inmates occupied the jail's holding cells at various times,

---

[34]Blakely Affidavit, at ¶ 4.

[35]*Id.*

[36]*Id.*; *see also* Rich Deposition, at 24.

[37]Rich Deposition, at 23.

[38]Blakely Affidavit, at ¶ 6; Blakely Supplemental Affidavit, at ¶ 3.

[39]Doc. no. 51, Exhibit F (Policy and Procedure Manual), at § 4(d).

but the jail had a policy that prevented males and females from being housed *in the same holding cell at the same time*.[40]   This policy was consistent with the jail's general policy against housing male and female inmates in the same cell.[41]   No male inmate was ever housed in plaintiff's cell, but two male inmates were housed in the holding cell adjacent to plaintiff's.[42]

Plaintiff's cell had a solid door with one window in it;[43] a bench, which was located on the right side of the cell, near the rear; and a toilet, which was located on the left side of the cell, near the front.[44]   The toilet was visible from the window in the cell door.[45]   Plaintiff's cell also contained a security camera, which was mounted on the left wall of the cell, near the front of the cell, but not directly above the toilet.[46] The camera was pointed so that it could capture images of both the bench on the right side of plaintiff's cell, and the toilet on the left side of the cell.[47]

---

[40]Blakely Affidavit, at ¶ 5; doc. no. 51, Exhibit E (Deposition of Mike Blakely), at 22.

[41]Blakely Deposition, at 28; Rich Deposition, at 32.  This policy is expressly embodied in the jail's Policy and Procedure Manual, which states that "[i]nmates shall be separated on the basis of sex."  Doc. no. 51, Exhibit F (Policy and Procedure Manual), at § 3(c).

[42]Caffey Deposition, at 46; Rich Deposition, at 23-24.

[43]Caffey Deposition, at 50.

[44]*Id.* at 52.

[45]*Id.* at 48, 66; doc. no. 63 (plaintiff's evidentiary submission), Exhibit 2 (Affidavit of Doris Baker), at 3; *id.,* Exhibit 4 (Affidavit of Brett Caffey), at 3.

[46]Caffey Deposition, at 52-53.

[47]*Id.* at 54; Baker Affidavit, at 3; Brett Caffey Affidavit, at 2; doc. no. 63, Exhibit 3 (Affidavit of Barney May), at 2.

The video feed from the camera in plaintiff's cell ran to a monitor located in the dispatch room of the jail, which was a secure area accessible only to authorized personnel.[48] All of the jail's corrections officers — male and female — had access to this room, and they regularly entered the room to deposit or pick up papers.[49] However, the monitor itself was visible only to individuals sitting in the dispatchers' chairs, as a panel separated the monitor area from the rest of the dispatch room.[50] Sheriff Blakely testified that the jail did not employ any male dispatchers on the dates plaintiff was incarcerated.[51] Nonetheless, two of plaintiff's visitors to the jail testified that male dispatchers or other male employees were working in the dispatch room, and that these men watched plaintiff on the monitor and made jokes about her.[52] Sheriff Blakely stated that the camera and the window in the cell door are both necessary security measures, because they allow jail personnel to observe inmates who might become ill or attempt to hurt themselves while incarcerated.[53]

During her incarceration, plaintiff was allowed to leave her cell and go to a separate room to meet with a visitor.[54] Plaintiff also received visitors in her cell,

---

[48]Blakely Affidavit, at ¶ 9.

[49]Blakely Deposition, at 44.

[50]Blakely Affidavit, at ¶ 9; Blakely Deposition, at 44.

[51]Blakely Affidavit, at ¶ 9; Blakely Deposition, at 43-44.

[52]Baker Affidavit, at 4; Brett Caffey Affidavit, at 2.

[53]Blakely Affidavit, at ¶ 8.

[54]Caffey Deposition, at 32-33.

including her husband, an NAACP member, a couple who brought her items of clothing, and her legal assistant.[55]  Additionally, a female jailer came to plaintiff's cell to check on her.[56]  A female jailer also required plaintiff to remove her pantyhose in her cell, because jail policy did not allow inmates to wear items of clothing — including pantyhose or belts — that could be used to hurt the inmate or other people.[57]

Sheriff Blakely testified that male jailers could have passed by the door of plaintiff's cell if they were taking inmates (male or female) to be fed, if they were moving inmates (male or female) from one cell to another, or if they were attending to inmates' medical needs.[58]  Jail policy prevented inmates, including "trustys," from entering the hallway outside the holding cells without being accompanied by a corrections officer.[59]  Despite this policy, male inmates walked unattended in the hallway outside plaintiff's cell and looked through the cell window.[60]  Some of the men in the hallway outside plaintiff's cell engaged in "lewd and lascivious behavior and shout[ed] sexual obscenities, ranging from sexual jokes to sexual threats."[61]

[55]*Id.* at 33, 37, 86, 89.

[56]*Id.* at 69, 72, 77-79.

[57]Blakely Affidavit, at ¶ 12.

[58]Blakely Deposition, at 17.

[59]Blakely Affidavit, at ¶ 11.

[60]Baker Affidavit, at 3-4; Brett Caffey Affidavit, at 2.

[61]Doc. no. 63 (plaintiff's evidentiary submission), Exhibit 17 (Affidavit of Sherryl Snodgrass

Jail policy also prevented male corrections officers from entering a female inmate's cell without being accompanied by a female officer.[62]  Despite this policy, plaintiff testified that male jailers entered her cell unaccompanied by a female jailer, and that male visitors traveled the hallway outside her cell unannounced and unaccompanied by a corrections officer.  Neither Sheriff Blakely nor corrections officer Vanessa Rich could identify the corrections officer who brought food into plaintiff's cell.[63]

Two of plaintiff's visitors to the jail observed that male inmates and male guards could view plaintiff in her cell, either through the window in the cell door, or through the video feed from the security camera.[64]  Both individuals shared their concerns over plaintiff's privacy interests with Sheriff Blakely, who took no action in response.[65]

**D.**   *Facts Relevant to the County Defendants*

Plaintiff does not recall speaking with any member of the Limestone County Commission during her incarceration.[66]  The individual commissioners testified that

---

Caffey), at 2-3.

[62]Blakely Affidavit, at ¶ 3.

[63]Blakely Deposition, at 21; Rich Deposition, at 16.

[64]Baker Affidavit, at 3-4; Brett Caffey Affidavit, at 2.

[65]Baker Affidavit, at 4; Brett Caffey Affidavit, at 2.

[66]Caffey Deposition, at 57-58.

they were unaware of plaintiff's incarceration until *after* she had been released from custody.[67]  The County Administrator and various members of the Commission also testified as to the extent of the Commission's involvement with the Sheriff and the jail.  According to their testimony, the Commission does not have authority to hire and fire the Limestone County Sheriff, to exercise supervisory or managerial control over the Sheriff,[68] or to promulgate policies for the day-to-day operation of either the Sheriff's Department or the county jail.[69]  The Limestone County Sheriff is in charge of operating the jail, and the Commission must provide the funding and facilities for the Sheriff to carry out his duties.[70]  In fact, the Commission's *only* duty with regard to the jail is to provide funding.[71]  The Commission does not assist the Sheriff in deciding where to house inmates within the jail.[72]  The Commission did not

---

[67]Doc. no. 54 (evidentiary submission of the County Defendants), Exhibit C (Deposition of David Seibert), at 14-15; *id.*, Exhibit D (Deposition of Tommy Raby, Jr.), at 19-20; *id.*, Exhibit E (Deposition of Bill Latimer), at 19-21; *id.*, Exhibit F (Deposition of Gerald Barksdale), at 14-15; *id.,* Exhibit G (Affidavit of Pam Ball), at ¶ 5.  Plaintiff objects to this fact on the grounds that the story of her arrest made the newspapers and television newspapers, and that supporters led protests on her behalf outside of the jail and the county courthouse.  Presumably, plaintiff believes that the Commissioners could not possibly have escaped news of her incarceration.  *See* Raby Deposition, at 20 (examination by plaintiff) ("You're probably the only personal [sic] in Limestone County who doesn't know my name today.").  Plaintiff's conjecture is insufficient to establish a material undisputed fact.  She offers no evidence to refute the Commissioners' testimony that they were unaware of her incarceration.

[68]Seibert Deposition, at 8.

[69]Ball Affidavit, at ¶ 3.

[70]Seibert Deposition, at 28; Ball Affidavit, at ¶ 3.

[71]Latimer Deposition, at 15.

[72]Ball Affidavit, at ¶ 4.

participate in the decision of where to house plaintiff within the jail, and none of its members had any notice of the deficiencies plaintiff claims were present in the jail.[73] Since the time of plaintiff's incarceration, Limestone County has constructed a new jail facility.[74] In the new facility, male inmates are segregated from female inmates.[75]

## PART THREE

### *Eighth Amendment Claim Against Deputy Sheriff Craig*

Plaintiff has produced no evidence to support an Eighth Amendment claim against Deputy Sheriff Allen Craig. Plaintiff testified that Craig arrested her and transported her to the jail. She offers no evidence that she had any contact with Craig after arriving at the jail, or that Craig was responsible for any of the conditions in the jail. Indeed, plaintiff testified that she named Deputy Craig as a defendant solely for the purpose of alleging an assault claim against him, based on the manner in which he placed her into the Sheriff's Department vehicle following her arrest. Plaintiff's assault claim since has been dismissed, and there is no evidence to support any further claim against him. Accordingly, summary judgment is due to be granted on plaintiff's Eighth Amendment claim against Deputy Sheriff Allen Craig.

## PART FOUR

---

[73]*Id.* at ¶ 5.

[74]*Id.* at ¶ 6. *See Lovett v. Limestone County,* Civil Action No. CV-00-S-3372-NE.

[75]Seibert Deposition, at 21.

-16-

*Eleventh Amendment Immunity for Sheriff Mike Blakely in his Official Capacity*

Sheriff Mike Blakely argues that the Eleventh Amendment bars plaintiff's Eighth Amendment claim against him in his official capacity. This court agrees.

The Eleventh Amendment has been construed in a manner that bars federal courts from hearing suits commenced by private litigants against non-consenting states for the retrospective recovery of money damages. *See*, *e.g.*, *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) ("Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States. The ultimate guarantee of the Eleventh Amendment is that non-consenting States may not be sued by private individuals in federal court.") (citations omitted); *Kimel v. Florida Board of Regents*, 528 U.S. 62, 73 (2000) ("[T]he Constitution does not provide for federal jurisdiction over suits against nonconsenting States."); *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (observing that the Eleventh Amendment insulates states from "private parties seeking to impose a liability [in federal court] which must be paid from public funds in the state treasury").

The Eleventh Amendment also shields state officials sued under § 1983 in an "official capacity" from federal court actions seeking money damages for past actions allegedly in violation of the Constitution or federal statutes, because such claims are

tantamount to a suit against the state itself; and, absent waiver or consent, the Eleventh Amendment bar remains intact. *See McMillian v. Monroe County*, 520 U.S. 781, 785 n.2 (1997); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Carr v. City of Florence*, 916 F.2d 1521, 1524 (11th Cir. 1990) (observing that, in such cases, "the state is considered the real party in interest because an award of damages would be paid by the state").

Additionally, it now is well established that Alabama sheriffs are deemed to be "arms of the State" when engaged in law enforcement activities and, consequently, are entitled to Eleventh Amendment immunity when sued in an official capacity under § 1983 for retrospective money damages. *McMillian*, 520 U.S. at 793 (1997) ("Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties."), *affirming McMillian v. Johnson*, 88 F.3d 1573, 1583 (11th Cir. 1996) (stating that "[o]ur holding here that Sheriff Tate is not a final policymaker for Monroe County in the area of law enforcement, because Monroe County has no law enforcement authority, really is just another way of saying that when Sheriff Tate engages in law enforcement he is not about the business of county government").

It also is settled that an Alabama Sheriff is entitled to claim Eleventh Amendment immunity from § 1983 claims asserted against him in his official

capacity, and seeking retrospective money damages for harmful events flowing from the administration of a county jail. *Turquitt v. Jefferson County*, 137 F.3d 1285, 1292 (11th Cir. 1998) (*en banc*) (holding that Alabama counties are not liable under § 1983 for harms that befall jail inmates due to improper operation of the county jail, or negligent supervision of its inmates, because counties have no responsibilities in those areas), *overruling Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

> Authority over inmates is expressly granted to Alabama Sheriffs. *See Turquitt*, 137 F.3d at 1289 (saying "the sheriff has control over the inmates in the jail, the employees of the jail, and the jail itself" and the "sheriff [ ] has the duty to ensure that inmates do not come to harm" (citing Ala.Code § 14-6-1)). The authority the Sheriff has over the Jail is totally independent of the county commission; so, the "sheriff acts exclusively for the state rather than for the county in operating a county jail." *Id*. at 1288. For this reason, Alabama sheriffs are considered arms of the state and protected by sovereign immunity in suits against them in their official capacity. . . . The Sheriff can be subject to suit only in her individual capacity, to which she might be entitled to qualified immunity.

*Marsh v. Butler County*, 268 F.3d 1014, 1028 (11th Cir. 2001) (*en banc*).

> Based on the foregoing, summary judgment is due to be granted on plaintiff's Eighth Amendment claim against Sheriff Blakely *in his official capacity.*[76]

---

[76]If plaintiff *had* offered any evidence to support a constitutional claim against Deputy Sheriff Craig in his official capacity, that claim also would have been barred by the Eleventh Amendment. A deputy sheriff is viewed as "an extension of the Sheriff" who employs him, and therefore he is protected by the Eleventh Amendment from suits against him in his official capacity. *Carr v. City of Florence,* 916 F.2d 1521, 1526-27 (11th Cir. 1990).

Because the court has determined that plaintiff's official-capacity claim against Blakely is barred by the Eighth Amendment, the court need not consider Blakely's argument that, in his official capacity, he is not a "person" subject to suit under 42 U.S.C. § 1983.

## PART FIVE

*Qualified Immunity for Sheriff Blakely in his Individual Capacity*

Sheriff Blakely also asserts that plaintiff's Eighth Amendment claim against him, in his individual capacity, is barred by the doctrine of qualified immunity.

**A.**   *Framework for Qualified Immunity Analysis*

The doctrine of qualified immunity protects government officials who are sued under 42 U.S.C. § 1983 for money damages in their personal, or individual, capacities, but only so long as "their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has established a two-part test for evaluating whether a defendant is entitled to qualified immunity. The "threshold question" that must be asked by the district court is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Thus, in this case, the court must initially answer the question of whether plaintiff has produced sufficient evidence to support an Eighth Amendment claim based upon opposite-sex viewing of her sexual organs during her incarceration.[77]

---

[77]*See* doc. no. 42 (April 7, 2005 Mandate from the Eleventh Circuit Court of Appeals), at 10 ("Caffey's amended complaint challenges several conditions of her confinement but only one — her opposite-sex viewing claim — states a cause of action. What Caffey is effectively complaining about is having to expose her sexual organs to members of the opposite sex when she undressed or

**B.**  *Discussion of Plaintiff's Eighth Amendment Claim*

The Eighth Amendment prohibits cruel and unusual punishment or, stated differently, "the 'unnecessary and wanton infliction of pain.'" *Harris v. Ostrout,* 65 F.3d 912, 916 (11th Cir. 1995) (quoting *Wilson v. Seiter,* 501 U.S. 294, 296-98 (1991) (in turn quoting *Estelle v. Gamble,* 429 U.S. 97, 104-05) (1976))).  "The Supreme Court says that prison officials will be liable for violating the Eighth Amendment when they are deliberately indifferent to the substantial risk of serious harm to inmates.  Put differently, officials, to be liable, must be aware of a substantial risk of serious harm to the inmates and not take reasonable measures to alleviate that risk." *Marsh*, 268 F.3d at 1026-27 (citing *Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994)).  To state an actionable claim, a plaintiff must allege (1) conditions of confinement that, in light of law that was clearly established on the date of the incident complained of, obviously amounted to cruel and unusual punishment under the Eighth Amendment, (2) the responsible state or county official was subjectively aware that such conditions posed a substantial risk of serious harm, (3) the responsible official responded to the known risk in an objectively unreasonable way, and (4) the constitutional violation caused the plaintiff's injuries.  *See Marsh*, 268 F.3d at 1028-30.

---

used the toilet in solitary confinement.  It is only this particular aspect of her Eighth Amendment claim that survives Rule 12(b)(6).") (footnote omitted).

> No static "test" can exist by which courts determine whether conditions
> of confinement are cruel and unusual, for the Eighth Amendment "must
> draw its meaning from the evolving standards of decency that mark the
> progress of a maturing society." The objective component of an Eighth
> Amendment claim is, therefore, contextual and responsive to
> contemporary standards of decency. Only a deprivation which denies
> "the minimum civilized measure of life's necessities" is grave enough
> to violate the Eighth Amendment.

*Bracewell v. Lobmiller,* 938 F. Supp. 1571, 1578 (M.D. Ala. 1996) (quoting *Jordan v. Doe,* 38 F.3d 1559, 1564 (11th Cir. 1994)). Thus, the Constitution does not require prisons to be comfortable; it merely prohibits prisoners from being subjected to inhumane conditions. *Farrow v. West,* 320 F.3d 1235, 1242 (11th Cir. 2003) (citing *Farmer,* 511 U.S. at 832). The length of an inmate's confinement "cannot be ignored in deciding whether the confinement meets constitutional standards." *Hutto v. Finney,* 437 U.S. 678, 686-87 (1978).

The Eighth Amendment's protection extends to invasions of inmates' bodily privacy, which are constitutionally *impermissible* if they are "devoid of penological merit and imposed simply to inflict pain." *Harris,* 65 F.3d at 916 (citing *Turner v. Safley,* 482 U.S. 78, 83-85 (1987)). Applying these principles, the Eleventh Circuit has held that "strip searches" of inmates *by guards of the same sex as the person searched* do not violate the Eighth Amendment when they are conducted uniformly and without a retaliatory motive. *Harris,* 65 F.3d at 916.

-22-

Other circuits have addressed claims involving bodily searches, or viewing, of an inmate's sexual organs by jail guards of the *opposite sex*.  For example, in *Kent v. Johnson,* 821 F.2d 1220 (6th Cir. 1987), the Sixth Circuit considered an Eighth Amendment claim by a male inmate based on the assertion that female guards viewed his naked body while he showered and used the restroom.  The court concluded the plaintiff's claim was sufficient to withstand a Rule 12(b)(6) motion to dismiss, because the plaintiff had alleged that female guards viewed him "at close range and for extended periods of time, to retaliate against, punish and harass him . . . ." *Id.* at 1227-28.  The court stressed that the outcome would have been different if the viewing by opposite-sex guards was only occasional, if jail policy limited opposite-sex viewing by guards to a minimum, or if there had been no evidence of the guards' malicious motivation.  *Id.* at 1228.

Additionally, in *Jordan v. Gardner,* 986 F.2d 1521 (9th Cir. 1993), the Ninth Circuit upheld the denial of summary judgment on an Eighth Amendment claim based upon random, non-emergency, suspicionless clothed body searches of female inmates by male guards.  *Id.* at 1531.  Conducting the searches required the male guards to flatten female inmates' breasts and touch their genitalia.  *Id.* at 1523.  The evidence demonstrated that such searches caused significant psychological pain to many of the female inmates, especially those who had suffered past physical or sexual abuse by

men.  *Id.* at 1523, 1525-26.  In addition, there was no evidence that the invasiveness of the searches was necessary to maintain jail security, or that equal employment opportunity concerns justified assigning male guards to conduct the searches.  *Id.* at 1527.

The Ninth Circuit distinguished *Jordan* in its later opinion in *Somers v. Thurman,* 109 F.3d 614 (9th Cir. 1997).  In *Somers,* a male inmate asserted an Eighth Amendment claim based upon the performance of *visual* body cavity searches and viewing the male inmate naked while showering by female corrections officers.  *Id.* at 615-16.  During the searches and the shower viewings, the female corrections officers "'pointed at'" the plaintiff, and made "'jokes among themselves.'" *Id.* at 616. The Ninth Circuit reversed the district court's decision to deny the officers qualified immunity on the plaintiff's Eighth Amendment claim.  *Id.* at 616, 622-24.  The plaintiff had not alleged that the officers' searches occurred without penological justification, or that any of the officers' actions were intended to humiliate him.  *Id.* at 622.  The court held that the cross-gender searches could not be considered "inhumane" under the Eighth Amendment, and it distinguished *Jordan* because Somers' situation involved neither physical contact by the guards, nor sensitive pre-existing psychological problems.  *Id.* at 624.  Observing that "[t]o hold that gawking, pointing, and joking violates the prohibition against cruel and unusual punishment

would trivialize the objective component of the Eighth Amendment test and render it absurd," the court held that the plaintiff failed to state a viable claim under the Eighth Amendment. *Id.*

The Seventh Circuit reached a similar conclusion in *Johnson v. Phelan,* 69 F.3d 144 (7th Cir. 1995). There, the court considered an Eighth Amendment claim by a male inmate, who alleged that female guards regularly saw him and other male inmates naked in their cells, the shower, and the toilet. *Id.* at 145. There was no allegation that female guards ever touched or deliberately harassed male inmates, or that the inmates had any particular susceptibility to psychological injury. *Id.* at 145, 147. The court observed that surveillance of inmates is obviously necessary for safety reasons, and that cross-sex monitoring also fostered the important objectives of making "good use" of prison staff and preventing equal employment opportunity problems related to the employment of female guards. *Id.* at 146-48. It stated that "[c]ross-sex monitoring is not a senseless imposition. . . . It cannot be called 'inhumane' and therefore does not fall below the floor set by the objective component of the eighth amendment [sic]." *Id.* at 150-51. Accordingly, the Seventh Circuit held that the plaintiff did not state an Eighth Amendment claim upon which relief could be granted. *Id.* at 151.

Most of the evidence in this case, even when construed in the light most

favorable to plaintiff, more closely resembles the circumstances of cases in which courts have *not* found an Eighth Amendment violation.  First, plaintiff repeatedly argues that she was housed in the "all-male section" of the jail, but she presents no evidence to support her argument.  Instead, the evidence shows that plaintiff was housed in an administrative holding cell, or "drunk tank," on the first floor of the jail, between the booking area and the all-female wing.  She admits she was never incarcerated in the same cell as a male inmate.  Further, even though males were temporarily housed in the holding and isolation cells adjacent to the one in which plaintiff was incarcerated, plaintiff was never placed in the "all-male" section of the jail, which occupied the second and third floors.  Any inmate — male or female — could have been placed in the holding and isolation cells adjacent to plaintiff's.  Sheriff Blakely offered legitimate reasons for his policy of temporarily placing inmates in holding cells, without regard to whether they might be temporarily housed near inmates of the opposite sex.[78]  He testified that the holding cells provided a convenient location to temporarily house inmates during the booking process, particularly if more than one inmate was being booked at the same time, or if an inmate refused to cooperate with the booking officer.  He also testified that plaintiff was placed in her holding cell because she refused to sign a portion of her booking

---

[78]See *Harris*, 65 F.3d at 916 (holding that a violation of an inmate's privacy interests will support an Eighth Amendment claim only if it is "devoid of penological merit").

form, and also because he believed she would be safer in that cell than in the female dormitory.  Plaintiff disputes that she failed to provide information during the booking process, but acknowledges that she did not sign the booking form.  She also acknowledges that she was not placed in the holding cell as a punishment.  Further, Sheriff Blakely's decision to place plaintiff in the holding cell in order to protect her is in accordance with the jail's policy of placing an inmate in single-cell housing when doing so is necessary for the inmate's protection.[79]

Although plaintiff alleges that the conditions of her confinement were humiliating, there is no evidence that plaintiff was placed in her windowed cell, or that she was monitored by video surveillance, for the *purpose* of humiliating her, or for any other malicious purpose.  There also is no evidence that plaintiff suffered from any pre-existing psychological condition which might render confinement in a holding cell with a windowed door and security camera, adjacent to cells occupied by men, particularly traumatic to her.  Plaintiff states in her affidavit that she has led a sheltered, "Christian," and "lady-like" life, and that she was psychologically unprepared for her incarceration experience.[80]  No doubt plaintiff's jail experience was unlike anything she previously had encountered.  However, her sheltered

---

[79]*See* doc. no. 51, Exhibit F (Policy and Procedure Manual), at § 4(d).

[80]*See* doc. no. 63 (plaintiff's evidentiary submission), Exhibit 17 (Affidavit of Sherryl Snodgrass Caffey), at 2.

background is *not* akin to the situation discussed in the *Jordan* opinion, where female inmates with painful histories of physical and sexual abuse were touched in intimate places by male guards.

Plaintiff's testimony establishes that, during her twenty-six to twenty-seven-hour confinement, male corrections officers entered her cell unannounced and unaccompanied by a female officer. However, there is no evidence that any male jailer saw plaintiff naked while he was present in her cell, or that any jailer, male or female, touched any private part of plaintiff's body. Male inmates, corrections officers, and visitors walked the hallway in front of plaintiff's cell and could see her through the window in her cell door, even while she was using the toilet. Additionally, the camera in plaintiff's cell captured images of her while she removed her pantyhose and used the toilet, and it sent the video feed to monitors located in an area accessible to male employees of the jail. During at least part of plaintiff's incarceration, males sat in the dispatchers' chairs and watched the live video feed from her cell. Some of the males who viewed plaintiff in her cell made jokes about her. The employees' joking, however, is not sufficient to support an Eighth Amendment violation. *See Somers,* 109 F.3d at 624 ("To hold that gawking, pointing, and joking violates the prohibition against cruel and unusual punishment would trivialize the objective component of the Eighth Amendment test and render

it absurd.").

Further, and importantly, Sheriff Blakely offered valid penological reasons for having a window in plaintiff's cell door, and for maintaining video surveillance over the cell at all times. *See Harris,* 65 F.3d at 916 (holding that a violation of an inmate's privacy interests will support an Eighth Amendment claim only if it is "devoid of penological merit"). He testified that the video camera and the door window were both necessary security measures, because they allow jail personnel to observe inmates who might become ill, or attempt to harm themselves. This explanation does not necessarily justify having *male* employees man the cameras, or observe plaintiff through the window in her cell door. Even so, legitimate reasons for those circumstances do exist. As the Seventh Circuit held in *Johnson,* opposite-sex monitoring "makes good use of the staff." *Johnson,* 69 F.3d at 147. In the Limestone County Jail, the holding cells are located in neither the all-male section, nor the all-female section. Thus, a holding cell could, at any given time, house either a male *or* a female inmate. Further, one of the holding cells could house a female inmate, while the other housed a male inmate. As the occupants of these cells often change, it would make little sense to arrange employees' work schedules, or to require employees to constantly switch monitoring stations, to ensure that no occupant of a holding cell ever was viewed by a member of the opposite sex. Thus, opposite-sex

monitoring of the video images from plaintiff's cell was not a "senseless imposition" in violation of the Eighth Amendment.  *Johnson,* 69 F.3d at 150.

However, it is difficult to discern any valid penological reason for allowing *unattended* male *inmates* and *visitors* to pass through the hallway outside plaintiff's cell and view her through the window in her cell door.  Defendants offered evidence that jail policy prohibited inmates, including "trustys," from being present in the hallway unattended by a corrections officer.  Even so, plaintiff has produced evidence that male inmates and visitors *were* present in the hallway, in violation of jail policy, and that these individuals viewed her through the window in her cell door.  Further, plaintiff produced evidence that Sheriff Blakely was aware of this viewing by unattended opposite-sex inmates, but took no action to address the issue.[81]  The court finds this evidence — of unattended male inmates and visitors being allowed to view plaintiff through the window in her cell door, and of Sheriff Blakely's failure to take appropriate action upon being notified of the condition — sufficient to support an Eighth Amendment claim based on opposite-sex viewing.

**C.**    *Violation of Clearly Established Law*

Having determined that plaintiff's evidence of viewing by unattended male inmates and visitors is sufficient to support an Eighth Amendment claim, the court

---

[81]*See* Baker Affidavit, at 4; Brett Caffey Affidavit, at 2.

must now answer the second question in the qualified immunity analysis:  *i.e.,* whether the Eighth Amendment right thus violated was clearly established.  *See Saucier,* 533 U.S. at 201.

In determining whether the unlawfulness of an official's actions was clearly established, "'the salient question is whether the state of the law [at the time of the unconstitutional act] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'"  *Williams v. Consolidated City of Jacksonville,* 341 F.3d 1261, 1270 (11th Cir. 2003) (bracketed alterations in original) (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)).   The Supreme Court has rejected this Circuit's requirement that the facts of previous cases must always be "materially similar" to those facing the plaintiff.  *Hope*, 536 U.S. at 739.  Instead,

> [f]or a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell* [*v. Forsyth,* 472 U.S. 511,] 535, n. 12, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope,* 536 U.S. at 741 (bracketed alterations in original).

_____An officer can receive "fair notice" of his or her unlawful conduct in various ways.

First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law.* This kind of case is one kind of "obvious clarity" case. For example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.

Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law.* When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. *See Marsh,* 268 F.3d at 1031-32 n.9. For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional *without tying* that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation. These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances. These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are often immaterial to the later decisions. But for judge-made law, there is a presumption against wide principles of law. And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent *that is tied to the facts.* That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court has said that "Y Conduct" is unconstitutional in "Z Circumstances." We believe that most judicial

> precedents are tied to particularized facts and fall into this category. .
> . . When fact-specific precedents are said to have established the law, a
> case that is fairly distinguishable from the circumstances facing a
> government official cannot clearly establish the law for the
> circumstances facing that government official; so, qualified immunity
> applies.  On the other hand, if the circumstances facing a government
> official are not fairly distinguishable, that is, are materially similar, the
> precedent can clearly establish the applicable law.

*Vinyard v. Wilson,* 311 F.3d 1340, 1350-52 (11th Cir. 2002) (emphasis in original).

The court does not have sufficient information before it to determine whether the Eighth Amendment right violated was in this case clearly established.  Sheriff Blakely argues that he is entitled to qualified immunity on all remaining aspects of plaintiff's Eighth Amendment claim, and plaintiff argues that he is *not* entitled to immunity.  Nonetheless, neither party makes any argument on whether plaintiff's right to be free from viewing by unattended male inmates and visitors is clearly established.  The court has seen no case law addressing those factual circumstances; rather, the relevant case law discusses viewing by opposite-sex *corrections officers,* not opposite-sex inmates.  Even so, the court concludes the burden of conducting the research and formulating arguments on whether qualified immunity is an available defense should rest on the parties, in the first instance, and not on the court.  Accordingly, the parties will be required, by separate order, to file supplemental briefs on the issue of qualified immunity.[82]

---

[82]Because the court is reserving ruling on one aspect of Blakely's motion for summary

The parties are reminded that the *only* factual claim relevant to the qualified immunity analysis is whether viewing by unattended opposite-sex inmates and visitors, without a valid penological purpose, violates plaintiff's Eighth Amendment rights. The court will expect briefs to be filed on this issue *only,* and will not consider any additional factual arguments.

### PART FIVE

### *Claims Against the County Defendants*

Plaintiff's claims against Limestone County and the Limestone County Commissioners are based upon the allegation that the Commissioners allowed her to be housed in the all-male section of the jail. Plaintiff claims that the Commissioners were aware of her incarceration, and that they should have had her moved from the all-male section. She testified that the Commissioners could have ordered her moved within the jail because they possess authority over the Sheriff and the jail.[83]

The County Defendants argue that summary judgment should be granted in their favor on the remaining aspects of plaintiff's Eighth Amendment claim because: (1) Limestone County cannot be held liable under 42 U.S.C. § 1983 on a *respondeat*

---

judgment, the court will not yet rule on Blakely's argument that plaintiff is not entitled to receive punitive damages. The court also will not consider plaintiff's remaining state law claim, until it reaches a final decision on Blakely's motion for summary judgment.

     Further, plaintiff also argues that Blakely's Eighth Amendment claim is barred by the principles of *res judicata* and issue preclusion. This argument is clearly without merit.

     [83]Caffey Deposition, at 100-01.

*superior* theory of liability; (2) defendants Blakely and Craig are not responsible for setting policy for Limestone County and, therefore, cannot be considered final policymakers for the County; and (3) all county defendants are immune from punitive damages under 42 U.S.C. § 1983.

Plaintiff failed to address any of the County Defendants' arguments. Instead, she asserts that

> the [County] Defendants' arguments presented in their motion for Summary Judgment mirror their arguments presented in their Motions to Dismiss; accordingly, their motions for summary judgment are due to be denied based upon the well-settled legal doctrines of *res judicata* and issue preclusion, as the issues therein have been previously deliberated and denied.[84]

This argument clearly is without merit, for the reasons stated by the County Defendants, and requires no further discussion by the court.

Further, the court agrees with the County Defendants' other arguments. The Eleventh Circuit has determined that Alabama counties cannot be liable under § 1983 for harms that befall jail inmates due to improper operation of the jail, or negligent supervision of its inmates or staff, because county governments have no responsibilities in those areas. *See Turquitt*, 137 F.3d 1285.

> Under the Alabama Code, the sheriff has control over the inmates of the jail, the employees of the jail, and the jail itself. The Code bestows upon the sheriff "the legal custody and charge of the jail in his

---

[84]Doc. no. 64 (plaintiff's reply brief), at 6.

county and all prisoners committed thereto." Ala.Code § 14-6-1 (1995). The Alabama Supreme Court has held that § 14-6-1 demonstrates that "the sheriff's authority over the jail is totally independent of the [county commission]." *King v. Colbert County*, 620 So. 2d 623, 625 (Ala. 1993). The sheriff appoints, directs and controls the deputies and jailers who work at the jail. Ala.Code § 14-6-105. The County has no authority to manage the sheriff's employees. *See Lockridge v. Etowah County Comm'n*, 460 So. 2d 1361, 1363 (Ala.Civ.App. 1984); *see also Terry v. Cook*, 866 F.2d 373, 379 (11th Cir. 1989) (finding that Alabama county commissioners have no authority to hire or fire deputies or jailers). In both the *King* and *Lockridge* decisions, the Alabama courts assumed as a matter of statutory construction that an express legislative delegation of authority to one official, the sheriff, necessarily meant that another entity, the county, possessed no authority in that area.

. . .

*Monell*, which firmly established that local governments could be sued under § 1983, is "a case about responsibility." *Pembaur* [*v. City of Cincinatti*], 475 U.S. 469, 478 [(1986)] (discussing *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). The County cannot be liable for the harms that befall jail inmates due to improper operation of the jail or negligent supervision of its inmates because the County has no responsibility in that area. . . .

. . .

[L]ocal governments can never be held liable under § 1983 for the acts of those whom the local government has no authority to control. A local government "must have power in an area in order to be held liable for an official's acts in that area." *McMillian*, 88 F.3d at 1577. . . . [A] local government can only be liable under § 1983 for injuries which the government itself caused, *Monell*, 436 U.S. at 691, 98 S. Ct. at 2036, and causation necessarily implies control.

*Turquitt*, 137 F.3d at 1289, 1291, 1292.

-36-

Indeed, the only responsibility of Limestone County and its Commissioners with regard to the Limestone County Jail is to provide the Sheriff with the proper funding to run the jail. *See* Ala. Code §§ 14-6-82;[85] 14-6-104;[86] 36-22-16;[87] 36-22-18.[88] Plaintiff has no remaining claim with regard to lack of proper funding for the jail, or with regard to the physical condition of the jail. Instead, her only remaining claim arises out of the Commissioners' alleged policy that allowed her to be housed in the "all-male section" of the jail and to be viewed by male inmates, visitors, and officers. Her complaints pertain to the day-to-day operation of the jail, and the control over its employees and inmates. The responsibility for those duties lies with the Sheriff, not with Limestone County or its commissioners. Therefore, there is no

---

[85]Section 14-6-82 provides that the Board of Corrections may order the county commission to

> put such jail, prison or almshouse and the grounds around the same in a proper sanitary condition and to make such repairs, alterations and additions as it may deem necessary, and may order the erection, if necessary, of new buildings, and the county commission . . . receiving such orders shall comply therewith and shall provide for the payment of the expenses of a compliance therewith out of the funds of the county . . . . If additions or new buildings are ordered, the county commission . . . may appeal to the Governor, who shall have final power to control in the matter.

[86]Section 14-6-104 states: "The expense incident to the construction, maintenance, sanitation, healthfulness and hygiene of each county jail and prison in this state shall be paid out of the funds of the county in which such institution is located . . . ."

[87]Section 36-22-16 requires the county to pay the sheriff's salary.

[88]Section 36-22-18 provides that the county commission "shall also furnish the sheriff with the necessary quarters, books, stationery, office equipment, supplies, postage and other conveniences and equipment, including automobiles and necessary repairs, maintenance and all expenses incidental thereto, as are reasonably needed for the proper and efficient conduct of the affairs of the sheriff's office."

basis by which the county or the commissioners can be held liable on plaintiff's Eighth Amendment claim pursuant to § 1983, and summary judgment is due to be granted on that claim.[89]

## PART SIX

### *Conclusion*

In accordance with all of the foregoing, the motion for summary judgment by the County Defendants is due to be granted in part, and plaintiff's Eighth Amendment claim against the County Defendants is due to be dismissed with prejudice.

The motion for summary judgment by the Sheriff Defendants is due to be granted in part, and the court will reserve ruling on part of the motion. Plaintiff's Eighth Amendment claim against defendant Allen Craig is due to be dismissed with prejudice. Plaintiff's Eighth Amendment claim against defendant Mike Blakely, in his official capacity, also is due to be dismissed with prejudice.

The court will reserve ruling on plaintiff's Eighth Amendment claim against Blakey, in his individual capacity, as well as on plaintiff's remaining state law claim against all defendants. The parties will be directed to file additional briefs on the issue of whether Blakely is entitled to qualified immunity on the remaining aspect of

---

[89]Because there is no basis for holding the county or the commissioners liable on plaintiff's § 1983 claim, the court need not address the County Defendants' argument that plaintiff cannot recover punitive damages from them.

plaintiff's opposite-sex-viewing claim under the Eighth Amendment.

An appropriate order will be entered contemporaneously herewith.

DONE this 31st day of August, 2006.

_____
United States District Judge